Filed 11/16/22  Howard v. Solarz CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| MEIGHAN E.E. HOWARD, as Trustee, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> M. NEIL SOLARZ et al., <br><br> Defendants and Respondents. | B311973 <br><br> (Los Angeles County Super. Ct. No. 19STCV31821) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Levinson Arshonsky & Kurtz, Robert A. Levinson and Lori E. Eropkin for Plaintiff and Appellant.

Charlston, Revich, Harris & Hoffman, and Tim Harris for Defendants and Respondents.

_____

## INTRODUCTION

This is an appeal of a judgment after the trial court sustained a demurrer to the plaintiff's first amended complaint as untimely. The court determined that, when the plaintiff commenced her action in 2019, more than one year had passed since her causes of action accrued under section 340.6 of the Code of Civil Procedure[1]—the limitations period the parties agree applies.

We are asked to consider whether the demurrer record supports such a determination. We find that it does. Some of the key facts underlying the plaintiff's claims were alleged in a complaint against the plaintiff and defendants here in a separate action in 2017. Other key facts include that the plaintiff was sued in that action and was unable to easily dispose of it. Under the circumstances, including the plaintiff's access to discovery in the separate action and the fact that she was represented in that action by independent counsel, there is no room for reasonable disagreement that plaintiff's causes of action accrued more than one year before she sued the defendants. Accordingly, we affirm.

## BACKGROUND[2]

Plaintiff and appellant Meighan Howard is the daughter of John Leroy Howard, M.D. (Dr. Howard) and Tommie Howard (Mrs. Howard). She is also the sister of John Cedric Howard.

---

[1]     Subsequent undesignated statutory references are to the Code of Civil Procedure.

[2]     Because we are reviewing a judgment after a demurrer, we take the facts from the operative complaint—Meighan's first amended complaint dated July 16, 2020—and from matters properly subject to judicial notice. (*Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 753–754.)

We refer to Meighan and John Cedric by given names for clarity and not out of disrespect.

Defendant and respondent Weinstock Manion is a law corporation and Solarz is an attorney shareholder of Weinstock Manion. For convenience, we refer to the defendants simply as "Weinstock" except where the distinction between them is material. Weinstock provides estate planning services, including legal and tax advice, for high-wealth individuals.

### A. Meighan Works with Weinstock to Facilitate Changes to Her Parents' Estate Plan Benefitting Her

In 2011, Dr. and Mrs. Howard engaged Weinstock to assist them in updating their joint estate plan. At the time, Dr. Howard was 85 years old and Mrs. Howard was 75. This representation extended at least through 2012 and resulted in, among other things, the creation of two irrevocable gift trusts (one funded by Dr. Howard and the other by Mrs. Howard) and the modification of an existing family trust called the Howard Family Trust. The gift trusts were used to make irrevocable inter vivos gifts to Meighan, who was named trustee and sole beneficiary of each. These gifts were valuable, including a vacation home and ranch land in Hawaii and more real property in Pasadena. The effect of the family trust modification was to disinherit John Cedric and make Meighan the sole beneficiary of Dr. and Mrs. Howard's estate (save for "a few specific gifts" earmarked for others).

Throughout this process, Meighan interacted with Weinstock "on behalf of her parents." But Weinstock also communicated with Dr. and Mrs. Howard directly, including in written correspondence, and Dr. and Mrs. Howard personally

3

signed the trust instruments effecting the changes that benefitted Meighan.

Having come to trust Weinstock through their work for her parents, Meighan hired Weinstock in 2015 to prepare her own estate plan.

### B. Dr. Howard Sues Meighan, Her Gift Trusts, and Weinstock

In April 2017, Dr. Howard filed a complaint (the Initial Howard Complaint) against Meighan, her two gift trusts, and Weinstock, thereby commencing what we refer to as "*Howard v. Howard*." The Initial Howard Complaint contained a total of 15 counts. According to Meighan, the "essence" of the Initial Howard Complaint was that "Meighan, [her gift trusts], Solarz, and Weinstock acted jointly and conspired together to transfer properties to Meighan without Dr. Howard's knowledge by creating irrevocable trusts in which Meighan was the sole beneficiary and by disinheriting John Cedric from the Howard Family Trust leading to Meighan ultimately being its sole beneficiary."

In addition to those counts asserted jointly against Meighan, her gift trusts, and Weinstock, the Initial Howard Complaint contained three counts against Weinstock only.[3]

---

[3] We are not bound by Meighan's characterization of the Initial Howard Complaint. Meighan requested and obtained judicial notice of the Initial Howard Complaint and, "where the allegations in the body of the complaint are contrary to documents incorporated by reference in it, we treat the documents as controlling over their characterization in the pleading." (*Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499.) As the trial

4

These were for "Legal Malpractice," "Disgorgement of Legal Fees," "Accounting," and injunctive relief.

In support of the "Legal Malpractice" count, Dr. Howard alleged that Weinstock communicated primarily with Meighan, leaving Dr. Howard in the dark about changes to his estate plan. He alleged that Meighan established herself as the "primary contact" with Weinstock for her parents and used this position to effectuate changes to the Howard Family Trust and creation of the gift trusts without Dr. Howard's knowledge or consent. He further alleged that neither Meighan nor Weinstock "fully informed [him] of the changes being made to his estate plan, and [he] was, as a result, not aware of the changes being made." He further alleged that he signed the family trust amendment and gift trust documents "[w]ithout being fully informed of the provisions of these documents . . . ."

Dr. Howard also alleged that the benefits Meighan stood to derive from the transactions created a conflict of interest to which he did not consent. He alleged that Weinstock failed to obtain Dr. Howard's "informed written consent to represent [Meighan's] interests upon learning [Meighan] wanted [Dr. and Mrs. Howard] to transfer several million dollars' worth of property out of the [Howard Family Trust] for [Meighan]'s benefit." He further alleged that Weinstock "actively favored [Meighan's] interests . . . without timely obtaining [Dr. Howard's] informed written consent to their concurrent representation of [Meighan] as

_____

court did, we consider the Initial Howard Complaint and other judicially noticed documents for their existence and content but not for the truth of the matters asserted therein. (*Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1090 (*Glaski*).)

5

required by Rule 3-310 of the California Rules of Professional Conduct . . . ."

Dr. Howard ended up filing a total of three amended complaints. The first amended complaint (the 1A Howard Complaint) was filed on June 9, 2017. Most significant to our analysis, the 1A Howard Complaint carried forward the "Legal Malpractice" claim against Weinstock substantially as pled in the Initial Howard Complaint.

Meighan and Weinstock each engaged their own separate defense counsel in *Howard v. Howard*. Meighan engaged Levinson Arshonsky & Kurtz, LLP (Levinson).[4] Through Levinson, Meighan unsuccessfully demurred to the 1A Howard Complaint on July 11, 2017.

Meighan alleges in the FAC that, throughout the *Howard v. Howard* proceedings, she and Weinstock each "took the position that none of [them] had committed any wrongs against Dr. Howard or the Howard Family Trust and that no conspiracy as alleged by Dr. Howard existed between Meighan, [her gift

---

[4]     Although Meighan does not expressly allege as much in her FAC, the trial court specifically considered this fact in its ruling on Weinstock's demurrer and Meighan does not challenge such consideration. There would be no merit in any such challenge. Meighan's separate counsel is identified on numerous documents from *Howard v. Howard* of which the trial court took judicial notice and courts may take judicial notice of the attorney of record in another proceeding. (See *Lewis v. Purvin* (1989) 208 Cal.App.3d 1208, 1218 ["While the face of the cross-complaint does not reveal that Davis is the attorney of record for the Lewises in the complaint pending against Purvin, we are entitled to take judicial notice of this fact under Evidence Code sections 452(d)(1) and 459"].)

trusts], and Weinstock.  They each testified that Dr. Howard consented to and instructed . . . Weinstock's actions with respect to Dr. Howard's and Mrs. Howard's estate plan and that Meighan acted as a conduit for information to and from her parents and . . . Weinstock."

Dr. Howard filed his third amended complaint (the 3A Howard Complaint) on September 24, 2018, more than a month after trial commenced.  The 3A Howard Complaint eliminated multiple counts from prior complaints but carried forward the "Legal Malpractice" claim against Weinstock substantially as pled in the Initial Howard Complaint.

Four days later, on September 28, 2018, the jury rendered a verdict that Weinstock was liable to Dr. Howard under theories of "Legal Malpractice," "Breach of Fiduciary Duty," and "Constructive Fraud."  The jury found that Meighan was not liable to Dr. Howard under any theory of the 3A Howard Complaint.

### C. Meighan Sues Weinstock

On September 9, 2019, Meighan, in her individual capacity and as trustee of her gift trusts, filed a complaint against Weinstock, thereby commencing the underlying action.  The complaint contains two counts, one for professional negligence and the other for breach of fiduciary duty.

Meighan's professional negligence count alleges that the various instruments benefitting her were "properly drafted" but that Weinstock breached their duty to Meighan by "failing to act as reasonably careful estate planning attorneys" in three fundamental respects:  First, by "representing clients with conflicting or potentially conflicting interests" without obtaining "the necessary waivers."  Second, by failing to communicate with

7

Dr. Howard in a manner that "would protect [Meighan] in case of an attack on the Trusts at a later time." And third, by "failing to properly document" Dr. Howard's intent to modify the Howard Family Trust and fund Meighan's gift trusts by some means beyond obtaining his signature on the instruments, such as obtaining his signature on another document confirming his intent, making a third party a witness to such intent, or videotaping a manifestation of that intent.

Meighan alleged that these failures caused Dr. Howard to commence *Howard v. Howard* against her. She claimed as damages the legal fees and costs she incurred in defending the action, estimated in excess of $1.5 million, as well as losses flowing from temporary asset freezes the *Howard v. Howard* trial court imposed.

Meighan's breach of fiduciary duty count sought the same damages on the theory that Weinstock "breached their fiduciary duties" to her and her gift trusts by "causing Dr. Howard to commence litigation against [Meighan]." In the absence of such breach, she alleges, "Dr. Howard would not have commenced [*Howard v. Howard*] or such litigation would have been quickly and easily disposed of . . . ."

As to the timing of her initial complaint, Meighan alleged that she "did not discover, nor could have discovered through use of reasonable diligence, [Weinstock's] wrongful conduct against [her] until September 28, 2018"—the date of the jury's verdict in *Howard v. Howard*. According to Meighan, whether Weinstock's actions with respect to her were proper "was contingent on the outcome of [*Howard v. Howard*]."

8

## D. The Trial Court Dismisses Meighan's Action on Statute of Limitations Grounds

Weinstock demurred to Meighan's initial complaint on, among others, statute of limitations grounds. They asserted that Meighan did not need a jury verdict against them to put her on notice of potential claims; rather, the allegations of the Initial Howard Complaint were sufficient. The trial court sustained the demurrer for failure to plead around the one-year statute of limitations imposed by section 340.6, subdivision (a), but gave Meighan leave to amend.

Meighan filed an amended complaint (the FAC) that elaborated on the allegations justifying her alleged delayed discovery. For example, she added allegations that Weinstock owed her additional fiduciary duties beginning in 2015 when she hired them to prepare her personal estate plan and that she trusted Weinstock.

She further added that the Initial Howard Complaint and the 3A Howard Complaint were materially different in that the former "was based on a theory of conspiracy between Meighan and [Weinstock] to intentionally defraud Dr. Howard," whereas the latter alleged damages "due to [Weinstock's] actions, regardless of whether [Weinstock] conspired with Meighan to intentionally defraud him or intentionally to keep him unaware of the full estate plan changes." She bolstered her allegations concerning the theory of the Initial Howard Complaint by reference to discovery responses from Dr. Howard that all his claims—even his "Legal Malpractice" claim—were premised on misconduct by Meighan.

Meighan further added that Weinstock, in *Howard v. Howard* discovery responses, denied the existence of any conspiracy and contended that they effectively communicated with, and acted at the direction of, Dr. and Mrs. Howard. She also added that Weinstock separately told her the same. And she added that Weinstock produced its entire file in the *Howard v. Howard* proceedings, which contained direct communications between Weinstock and her parents as well as instructions from Meighan on behalf of her parents that Weinstock promised to confirm with them.

Weinstock again demurred on statute of limitations grounds, and the trial court again sustained the demurrer—this time without leave to amend. A judgment of dismissal entered and Meighan timely appealed.

## DISCUSSION

## I. Demurrer and Standard of Review

"When any ground for objection to a complaint . . . appears on the face thereof, or from any matter of which the court is required to or may take judicial notice, the objection on that ground may be taken by a demurrer to the pleading." (§ 430.30, subd. (a).) The statute of limitations is one such "ground for objection to a complaint" and may therefore be raised by demurrer. (*Cavey v. Tualla* (2021) 69 Cal.App.5th 310, 325 (*Cavey*).)

"Generally, an order sustaining a demurrer on statute of limitations grounds is subject to de novo review on appeal. [Citation.] The untimeliness of the lawsuit must clearly and affirmatively appear on the face of the complaint and matters judicially noticed before an appellate court will affirm an order sustaining the demurrer. [Citation.] Under this standard,

10

allegations in the complaint or judicially noticed materials showing the claim *might* be barred are not enough." (*Cavey*, *supra*, 69 Cal.App.5th at p. 326.)

In conducting our review, "[w]e give the complaint a reasonable interpretation and treat the demurrer as admitting all material facts properly pleaded that are not inconsistent with other allegations, exhibits, or judicially noticed facts. [Citations.] We need not accept as true, however, deductions, contentions or conclusions of law or fact." (*Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 292.) It is the plaintiff's burden to demonstrate that the trial court erred. (*Id.* at p. 293.)

We separately review for abuse of discretion a trial court's denial of leave to amend in connection with the sustaining of a demurrer. (*SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 317.) In this regard, the plaintiff bears the burden to show that "there is a reasonable possibility that the defect in the complaint can be cured by amendment." (*Ibid.*)

II. **Analysis**

A. **The Trial Court Properly Sustained Weinstock's Demurrer**

The parties agree that Meighan's claims are subject to the one-year limitations period contained in section 340.6, subdivision (a), which provides, in relevant part: "[a]n action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission . . . ." Section 340.6 further provides for the tolling of the limitations period until the plaintiff has, in relevant part,

11

"sustained an actual injury." (§ 340.6, subd. (a)(1).) As such, accrual for purposes of section 340.6, subdivision (a), ordinarily occurs when the aggrieved party (i) knows or should know of facts constituting the wrongful act or omission; and (ii) suffers appreciable and actual harm. (*Samuels v. Mix* (1999) 22 Cal.4th 1, 11.)

Meighan and Weinstock disagree as to when Meighan's claims against Weinstock accrued. Meighan contends they accrued on September 24, 2018, the date of the 3A Howard Complaint, by which "Dr. Howard's action against [Weinstock] took a sharp right turn" to allege wrongdoing by Weinstock "wholly distinct from any allegation of wrongdoing by Meighan." According to Meighan, it was only at "th[is] moment [that she] went from alleged participant in the failure of professional services by [Weinstock] to potentially injured party." Weinstock contends the limitations period began to run no later than July 17, 2017, when Meighan demurred to Howard's first amended complaint. We, like the trial court did, agree with Weinstock.

1.    **Accrual May Be Decided on Demurrer**

When discovery should have occurred or harm was sustained are generally questions of fact. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 743 (*Jordache*).) However, "courts should sustain demurrers based on section 340.6 in appropriate circumstances." (*Croucier v. Chavos* (2012) 207 Cal.App.4th 1138, 1145 (*Croucier*).) "[I]f the undisputed facts do not leave any room for reasonable differences of opinion, the question of when 'a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule . . .' should be decided as a matter of law, by evaluating the allegations in light

12

of matters that are properly subject to judicial notice." (*Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 175.)

### 2. Meighan's Claims Against Weinstock Accrued More Than One Year Before She Sued Them

Meighan filed her demurrer to the 1A Howard Complaint on July 17, 2017. The pleadings and documents of which the trial court properly took judicial notice[5] demonstrate that, by this date, Meighan had information sufficient to cause her to discover the facts constituting Weinstock's wrongful acts and omissions underlying the claims of the FAC. Specifically, by this date, Meighan had notice of Dr. Howard's legal malpractice allegations against Weinstock and that Dr. Howard had sued her and Weinstock. Moreover, Meighan incurred legal fees defending Dr. Howard's claims more than a year before she commenced her action against Weinstock.

---

[5] Meighan's opening brief begins with an argument that the trial court "errantly employed judicial notice to resolve a disputed veracity and import of pleadings from [*Howard v. Howard*]." We are unpersuaded by this contention. Indeed, the trial court limited its judicial notice to the fact of the documents offered by the parties (without objection by either side). It specifically did not consider "the truth of the matters asserted" therein. Even if the trial court had erred as Meighan asserts, we do not repeat the error in our independent analysis, rendering the point moot. We consider the judicially noticed documents only for their existence and content but not for the truth of such content. (*Glaski, supra*, 218 Cal.App.4th at p. 1090.)

### a. Meighan Knew or Should Have Known of the Wrongdoing Alleged in Her FAC from Dr. Howard's Legal Malpractice Allegations

A person should know of the facts constituting the wrongful act or omission once she "suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 (*Jolly*).) The limitations period thus begins to run when a plaintiff " ' " ' "has notice or information of circumstances to put a reasonable person on *inquiry* . . . ." ' " [Citation.] A plaintiff need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.' " (*Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 818 (*Bergstein*), quoting *Jolly*, *supra*, 44 Cal.3d at pp. 1110–1111.)

The wrongful acts or omissions underlying Meighan's claims in the FAC are that: (1) Weinstock failed to obtain requisite conflicts waivers from Dr. and Mrs. Howard while communicating with Meighan about creating the gift trusts and modifying the Howard Family Trust for her benefit; (2) Weinstock failed to communicate with Dr. Howard in a manner that would protect Meighan in case he later challenged the gift trusts and family trust modifications; and (3) Weinstock failed to document Dr. Howard's intent with respect to the gift trusts and family trust modifications beyond obtaining his signature on the relevant trust instruments.

14

There is no room for dispute that a reasonable person in Meighan's situation would have made further inquiry concerning the wrongdoing alleged in the FAC based on the legal malpractice allegations contained in the Initial Howard Complaint and 1A Howard Complaint. Meighan had notice of such allegations not later than July 17, 2017—more than a year before she commenced the underlying action—when she demurred to the 1A Howard Complaint. This is so because, whether or not Meighan personally reviewed the 1A Howard Complaint, her counsel, Levinson, had to in order to prepare Meighan's July 17, 2017, demurrer. Levinson's knowledge of the allegations in the 1A Howard Complaint is imputed to Meighan for discovery purposes. (See *Miller v. Bechtel Corp*. (1983) 33 Cal.3d 868, 875 (*Miller*).)

Further, Meighan had the ability to investigate the allegations by virtue of her status as a party to the litigation, represented by independent counsel, where the allegations were made. As an example of the information available to her as a party, Meighan alleges that, in the course of discovery in *Howard v. Howard*, Weinstock produced its "entire file related to Dr. Howard and Mrs. Howard." As further discussed below, even if she made no other investigation, what was absent from that file makes up the factual core of Meighan's claims against Weinstock.[6]

---

[6] We acknowledge that Meighan may have gained access to Weinstock's file later than the date of her demurrer to the 1A Howard Complaint. However, the precise date does not matter because the FAC reflects that Weinstock's file was produced more than a year before Meighan sued Weinstock on September 9,

15

As to the lack of a conflict waiver, Dr. Howard alleged in the 1A Howard Complaint that Weinstock failed to obtain his "informed written consent to represent [Meighan's] interests upon learning [Meighan] wanted [Dr. and Mrs. Howard] to transfer several million dollars' worth of property out of the [Howard Family Trust] for [Meighan]'s benefit." He alleged that Weinstock represented Meighan and her parents concurrently, and, as the representation proceeded without Dr. Howard's informed written consent, it constituted a violation of Rule 3-310 of the California Rules of Professional Conduct then in effect (governing, among other things, conflicts of interest). A review of Weinstock's file would have revealed the absence of a conflicts waiver. Finding none would have permitted Meighan to make her FAC allegations concerning Weinstock's failure to obtain a conflicts waiver.

As to the inadequacy of communication from Weinstock to Dr. Howard, the 1A Howard Complaint is replete with allegations that Weinstock failed to communicate the significance of documents they had him sign. For example, Dr. Howard alleged that (a) Weinstock failed to keep him "informed of any of the changes being drafted into his estate plan"; (b) no one "fully informed [him] of the changes being made to his estate plan, and [he] was, as a result, not aware of the changes being made"; (c) no

2019: Meighan alleges that the discovery in *Howard v. Howard* took place before trial commenced on August 20, 2018. And, Meighan had a full complement of discovery tools at her disposal after reviewing the 1A Howard Complaint to probe the existence or non-existence of conflicts waivers, supplemental documentation of intent, or any of the other documentation the absence of which Meighan claims caused her harm.

16

one "ever explained to [him] the consequences of making irrevocable transfers of property to [Meighan]"; (d) "nobody fully explained" to him the various trust instruments; (e) no one ever "explained the provisions contained in the estate planning documents [he] signed"; and (f) Weinstock had him sign other documents whose "contents, effect and significance were not explained to him." Dr. Howard's allegations, at a minimum, put Meighan on notice there was a claim of deficient communication by Weinstock. A review of Weinstock's file would have revealed the extent to which Weinstock documented its communication with Dr. Howard and the quality of the communication so documented. What she found would have allowed Meighan to make her FAC allegations concerning the inadequacy of Weinstock's communication with Dr. Howard and/or its documentation of such communication.

As to the failure to document Dr. Howard's intent in executing the trust instruments and other documents, the 1A Howard Complaint contains allegations that Dr. Howard did not intend the effect of these things. For example, Dr. Howard alleged that (a) the only estate plan changes he ever understood Weinstock was helping him make were "to ensure [John Cedric] would receive his inheritance . . . over time rather than all at once"; (b) "it was never a part of [his] expressed desires to make immediate inter vivos and irrevocable gifts of property worth several million dollars to [Meighan]"; (c) the revisions Weinstock made to his estate plan "were a dramatic departure from his desires"; (d) the trust instruments effected property transfers to Meighan "without his knowledge or consent"; and (e) he had no intent to execute the grant deeds that funded Meighan's gift trusts.

Even though Dr. Howard did not specifically allege the absence of supplemental documentation (e.g., videos, third-party witness, etc.) that Meighan complains of in the FAC, his allegations of contrary intent were sufficient to put Meighan on inquiry notice as to whether such supplemental documentation existed. Meighan asserts she "knew" Dr. Howard's allegations that she overrode his intent were false when he made them. A reasonable person in her position of defending against these allegations would have promptly ascertained—by, for example, reviewing the Weinstock file to which she had access—whether any evidence existed to corroborate her understanding of Dr. Howard's contemporaneous intent in 2012.

Meighan's own theory of her case confirms as much. Meighan's allegations are that a reasonably careful estate planning attorney would have documented Dr. Howard's intent in a way that would have prevented Dr. Howard from suing her or, at the very least, allowed *Howard v. Howard* to be "quickly and easily disposed of instead of contested litigation and a lengthy trial." But Dr. Howard did sue her. And Meighan was unable to "quickly and easily dispose[] of" *Howard v. Howard.* As alleged in the FAC, "extensive discovery and heavily contested law and motion" took place through as late as August 20, 2018, and the ensuing mixed court and jury trail spanned more than a month. Meighan surely knew before September 9, 2018—when she was halfway through trial—that Weinstock failed to create the silver-bullet documentation to avoid trial that Meighan claims it should have.

18

Even if Meighan disbelieved Dr. Howard's specific allegations that Weinstock failed to obtain a conflicts waiver and failed to adequately communicate to him the import of the trust instruments, she ignored them at her own peril. They were made in serial complaints signed by counsel. By each signature, counsel certified that "[t]he allegations and other factual contentions ha[d] evidentiary support or, if specifically so identified, [we]re likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." (§ 128.7, subd. (b)(3).) Dr. Howard's allegations concerning a lack of conflicts waiver and inadequacy of communication were made without qualification concerning the need for further investigation or discovery. Thus, by no later than July 2017, Meighan had the certification of a member of the bar that the basic allegations now underlying her complaint had evidentiary support. A reasonable person in her situation would have investigated these allegations. Given the access to information her situation afforded her, such an investigation would have uncovered the facts underlying her claims against Weinstock.

In short, the allegations on the face of the 1A Howard Complaint leave no room for reasonable difference of opinion: Meighan had knowledge of facts that, at the very least, were sufficient to put a reasonable person on inquiry of the conduct she alleges as wrongful in her FAC. We underscore that we reach this conclusion without accepting that Dr. Howard's allegations were true; only that they were made. Meighan's arguments to the contrary are unpersuasive.

19

### i. Accrual Does Not Turn on Resolution of Meighan's "Issues of Disputed Fact"

Meighan argues that the trial court erred in concluding that the 1A Howard Complaint put Meighan on notice of her claims against Weinstock because such conclusion rested on three "heavily disputed material issues of fact." According to Meighan, these issues were (1) whether she controlled Dr. Howard's estate at the time of the trust instruments; (2) whether she was the "sole conduit" between Weinstock and Dr. Howard; and (3) whether Weinstock was serving her interests, and not Dr. Howard's, in preparing the trust instruments. The fundamental problem with Meighan's argument is she fails to demonstrate the relevance of these purported factual disputes.

As a preliminary matter, we review the trial court's conclusion, not its reasoning. (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 610.) Thus, even if the trial court had employed the mode of analysis Meighan ascribes to it,[7] it would not matter to the outcome of the appeal. It is Meighan's burden on appeal to show that the purportedly disputed facts preclude determination of the accrual date at the demurrer stage. Meighan fails to demonstrate how disagreements about the degree of her control over the estate, the extent of her involvement in facilitating communications between

---

[7] This is not apparent from either the trial court's decision or Meighan's briefing. All citations in Meighan's opening brief to where the purportedly disputed facts were discussed are to Weinstock's demurrer papers, with further references to the FAC or Meighan's request for judicial notice in support of the FAC to show the claimed dispute. Meighan does not direct us to a resolution by the trial court of any of the three identified "disputed material issues of fact."

Weinstock and Dr. Howard, or her understanding of legal ethics meant accrual could not be determined on the pleadings and documents subject to judicial notice before the trial court.

As the trial court found, and as we affirm, *supra*, Meighan's knowledge of the allegations of the 1A Howard Complaint in the context of Dr. Howard's lawsuit against her and Weinstock is sufficient to charge her with knowledge of the facts underlying her later claims against Weinstock. She had knowledge of Dr. Howard's allegations in 2017 *without regard* to whether she controlled Dr. Howard's estate in 2011 and 2012 when Weinstock was planning and preparing the trust instruments; *without regard* to her status as an exclusive or non-exclusive conduit during that period; and *without regard* to whether she understood in 2017 that the conflict waiver she alleges in the FAC was obligatory was, in fact, obligatory.

Meighan argues that her status as a layperson meant she lacked "actual knowledge" in 2017 that would allow her "to identify whether [Weinstock] had committed negligence in the frequency, quality, or scope of communications with Dr. Howard, absent further investigation." But accrual under section 340.6 does not require her actual knowledge, nor does it disregard what she might have learned from "further investigation."[8] To the

_____

[8]    Meighan elsewhere states that she was "not properly charged with knowledge of [her] causes of action for malpractice and breach of fiduciary duty until [she] had an opportunity to investigate, to obtain a more complete view of [Weinstock's] actual services, and to learn that Dr. Howard was the victim of [Weinstock's] negligence." This again misstates the law. The one-year limitation period affords the prospective plaintiff the opportunity to investigate the facts and determine whether to

21

contrary, a plaintiff is charged with knowledge of facts she does not know but would know if she had performed the investigation a reasonable person would have under the circumstances. (*Bergstein*, *supra*, 236 Cal.App.4th at p. 818.) Further, it was not necessary that Meighan understood the specific legal theory that the discoverable facts would support. (*Croucier*, *supra*, 207 Cal.App.4th at p. 1146.) The discoverable facts alone are sufficient to trigger accrual.

For this reason, too, Meighan did not need to understand what gave rise to the need for a conflict waiver to be put on inquiry notice that Weinstock failed to obtain one when it should have. Dr. Howard's complaints alleged there was none and that one was needed. Meighan argues that Dr. Howard's allegations were not sufficient to put her on notice because he alleged that a conflicts waiver was necessary only because Meighan was using Weinstock "to accomplish a fraud upon Dr. Howard" and she knew she was not attempting to defraud him. Whether or not this is a reasonable interpretation of Dr. Howard's allegations concerning conflict waivers, Meighan again is putting theory over facts. Meighan was aware that she was heavily involved in Weinstock's work for Dr. and Mrs. Howard—in her words, "a conduit for information to and from her parents and . . . Weinstock." She was also aware that the work greatly benefitted her. For example, she knew that, by Weinstock's work, she received the Hawaiian vacation home, the Hawaiian ranch land, and a property in Pasadena, and she also became the sole

---

sue. (See *Miller*, *supra*, 33 Cal.3d at p. 875 [duty to investigate triggered by "facts which would make a reasonably prudent person suspicious"].) It does not await her investigation once she is on inquiry notice.

beneficiary of the Howard Family Trust.  Finally, Meighan was aware that Weinstock's failure to obtain a conflicts waiver contributed to the harm she complains of in the FAC: Dr. Howard suing to attack the validity of Weinstock's work that she facilitated and resulted in tremendous benefits to her.  These facts were sufficient to put her on inquiry notice as to the necessity of a conflicts waiver under the circumstances, even if the circumstances proved not to be what Dr. Howard was alleging at the time.

Simply put, resolution of Meighan's "disputed facts" is unnecessary to conclude that, with notice of Dr. Howard's allegations in the 1A Howard Complaint, Meighan, through use of reasonable diligence, should have discovered the facts constituting the wrongful acts or omissions underlying the FAC.  By no later than July 2017, Meighan had notice of allegations of wrongdoing by Weinstock in the 1A Howard Complaint that Meighan later adopted as her own.  Under the circumstances, that was enough to commence the limitations period for her to commence an action based on those allegations herself.

**ii.    Dr. Howard's Factual Allegations, Not His Legal Theories, Are What Put Meighan on Inquiry Notice.**

Meighan also argues that the malpractice allegations in the 1A Howard Complaint were insufficient to put her on notice of the facts underlying her claims because they were intertwined with Dr. Howard's fraud allegations that she knew to be, and were later proven to be, false.  She reasons that it was not until the September 24, 2018, 3A Howard Complaint, wherein Dr. Howard dropped his fraud allegations and added his constructive fraud claim against Weinstock, that she was properly charged with notice of Weinstock's wrongful acts.  We cannot agree.

23

The factual allegations of inadequate communication and documentation and lack of waiver were there for her to see from the Initial Howard Complaint on through the 3A Howard Complaint. They were not dependent on the fraud allegations or fraud theories.[9] Indeed, Meighan's acknowledgement that the 3A Howard Complaint's constructive fraud allegations were sufficient to put her on notice is a concession that the legal malpractice allegations in the 1A Howard Complaint were, too. The operative allegations underlying the new constructive fraud count were that Weinstock had a fiduciary duty to Dr. Howard; that Weinstock failed to explain or disclose to Dr. Howard the purpose and effect of the estate planning documents; that those documents did not align with Dr. Howard's intentions; and that Dr. Howard suffered harm in the form of lost assets and legal fees as a result. None of these alleged facts were novel.

Weinstock's fiduciary duty flowed directly from a fact known to Meighan from 2011: that Weinstock acted as Dr. Howard's attorneys. (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 416, disapproved on other grounds in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1154 [fiduciary duty to clients imposed on

---

[9] Meighan refers to an interrogatory response from Dr. Howard which she characterizes as stating "that even [Dr. Howard's malpractice claim against [Weinstock] was based on Meighan's alleged conspiracy with [Weinstock]." This does not diminish Dr. Howard's specific allegations of independent failures by Weinstock. That they may have been offered as the basis for one theory of wrong does not mean that the same facts, or the facts that would have been uncovered if Meighan had made a reasonable investigation, would not also support a different theory.

24

attorneys by law].)  The 1A Howard Complaint included allegations that Weinstock "never explained the provisions contained in the estate planning documents" to Dr. Howard. And the purpose of the 1A Howard Complaint was to recover the assets transferred pursuant to those estate planning documents because Dr. Howard alleged he never intended the transfers.

Relatedly, Meighan's 2017 notice of the facts alleged in the 1A Howard Complaint that form the basis of her claims against Weinstock distinguish her situation from those of the plaintiffs in *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797 (*Fox*) and *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308 (*E-Fab*).  In *Fox*, the plaintiff sued her doctor for malpractice relating to a failed surgery and then, through discovery, learned that a medical device her doctor used during the surgery might have been defective and contributed to her injury.  (*Fox*, *supra*, 35 Cal.4th at p. 804.)  When she sued the device manufacturer, it demurred on grounds that her cause of action against it accrued at the same time as her cause of action against the doctor.  The Supreme Court held that her suspicion of the doctor's malpractice did not necessarily charge her with suspicion of the manufacturer's device defect: "a diligent plaintiff's investigation may only disclose an action for one type of tort . . . and facts supporting an entirely different type of tort action . . . may, through no fault of the plaintiff, only come to light at a later date."  (*Id.* at p. 814.)  It was only through discovery that the plaintiff was reasonably able to learn about issues with the medical device.

25

*E-Fab* presents a similar fact pattern. In that case, the plaintiff discovered that an employee, referred to it by a staffing agency, had embezzled money from the plaintiff. (*E-Fab*, *supra*, 153 Cal.App.4th at p. 1313.) This prompted a criminal investigation during which the police informed the plaintiff that the employee had a criminal record prior to being referred by the staffing agency. Only then did the plaintiff realize that the staffing agency had failed to discover or disclose the criminal record. (*Id*. at p. 1314.) When the plaintiff sued the embezzler and the staffing agency, the staffing agency demurred, arguing the plaintiff's causes of action accrued in the year it provided staffing services (when the embezzlement also began). The Court of Appeal disagreed, concluding that the accrual was not earlier than when the police notified the plaintiff of the embezzler's criminal record. It was only through the police investigation that the plaintiff was reasonably able to learn that the staffing agency's representations about its screening efforts were false. (*Id*. at p. 1323.)

Here, the allegations sufficient to put Meighan on notice of the facts underlying Weinstock's alleged wrongful acts were not hidden from Meighan until some later event. Starting with the Initial Howard Complaint and in each one thereafter, they were there for her to see. That in the earlier complaints they were mixed with allegations of other wrongful acts used to support other theories of recovery—that they were not, in Meighan's words, in a "spotlight"—did not render them invisible. Meighan needed only to give any of the complaints a reasonably careful read to be aware of the allegations that Weinstock had committed the wrongful acts or omissions Meighan alleges in the FAC. *Fox* and *E-Fab* are inapposite.

26

### iii. Meighan's Engagement of Weinstock to Prepare Her Personal Estate Plan in 2015 Does Not Affect Her Duty to Investigate Dr. Howard's Allegations

Meighan argues that, because she "was in [a] fiduciary relationship with [Weinstock]" at the time she is charged with having gained knowledge of their wrongdoing, accrual was delayed until she actually discovered Weinstock's wrongdoing. She further argues that, because of their fiduciary relationship, she was entitled to rely on "assurances" Weinstock gave her about their dealing with Dr. Howard.

In support of her arguments that her relationship with Weinstein reduced her burden of discovery, Meighan cites authority that "[a] client damaged in the context of an attorney-client relationship is under no duty to investigate [the] attorneys' actions unless [the client] has *actual* notice of facts sufficient to arouse the suspicions of a reasonable person" (italics added); and that once attorneys "undertake to represent [a client], [the client is] entitled to rely on their recommendations as licensed professionals and to assume they were acting solely in [the client's] best interest." (*Johnson v. Haberman & Kassoy* (1988) 201 Cal.App.3d 1468, 1476 (*Johnson*).) However, Meighan cites no authority imposing a reduced burden of discovery based on a fiduciary relationship under the circumstances presented here.

Weinstock's wrongdoing allegedly occurred when they were estate planning attorneys for Meighan's parents. Approximately three years after that representation concluded, Meighan hired Weinstock as her own estate planning attorneys. But when Dr. Howard sued Meighan and Weinstock approximately two years later, Meighan hired Levinson as her own independent counsel. It was while Meighan was represented by Levinson in

27

*Howard v. Howard* that Meighan was charged with knowledge of Dr. Howard's allegations sufficient to put her on inquiry notice. Meighan cites no case in which a plaintiff's discovery burden was reduced as to facts discoverable while represented by separate counsel in connection with the matter in which the wrongdoing was alleged to have occurred.

In *Johnson*, *supra*, 201 Cal.App.3d 1468, the plaintiff alleged his lawyers committed malpractice while representing him in connection with a limited partnership interest. He alleged that his lawyers gave him bad advice to sell his interest at a loss. Approximately six years later, a second lawyer advised him of the flaw in his former lawyers' advice and that his former lawyers had secretly undertaken an adverse representation around the time that they gave the flawed advice. (*Id*. at p. 1472.) When the plaintiff sued his former lawyers, they obtained summary judgment on statute of limitations grounds. The appellate court reversed and found that the plaintiff did not discover his claims until the second lawyer alerted him to the first lawyers' wrongdoing. (*Id*. at p. 1478.)

In its analysis, the Johnson court noted that "[a] client damaged in the context of an attorney-client relationship is under no duty to investigate his attorneys' actions unless he has actual notice of facts sufficient to arouse the suspicions of a reasonable person." (*Johnson*, *supra*, 201 Cal.App.3d at p. 1476.) Once a client has engaged counsel in a matter, it continued, the client is "entitled to rely on their recommendations as licensed professionals and to assume they were acting solely in his best interest." (*Ibid*.) A rule failing to respect such an entitlement, the court reasoned, "would in effect require a client to consult a second lawyer in every case for another opinion." (*Ibid*.) In

28

recognition of "the inability of the layman to detect misapplication," the *Johnson* court applied relaxed discovery rules in that case.  (*Id.* at p. 1477.)

While Meighan may have been a client of Weinstock's when Dr. Howard sued them, her claimed harm did not arise "in the context of" that relationship.  Rather, it arose from work that Weinstock had done for Meighan's parents.  And Meighan did not hire Weinstock, her co-defendant, to represent her when Dr. Howard sued them.  Instead, she hired Levinson.  Thus, she was relying on Levinson, and not Weinstock, for legal advice in connection with *Howard v. Howard*.  Moreover, because she was represented by Levinson, subjecting Meighan to the duty to investigate Dr. Howard's allegations made in *Howard v. Howard* would not burden her with consulting a new lawyer regarding Weinstock's actions—she already had one.  To treat her as an "unsophisticated lay[person]" as the *Johnson* court treated the plaintiff in that case before he obtained independent counsel would be to disregard these material differences.

*Electronic Equipment Express, Inc. v Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834 (*Electronic Equipment*) was an appeal following a verdict for the plaintiff business in an accounting malpractice case.  The defendant accounting firm challenged the sufficiency of the evidence supporting the conclusion that the plaintiff's claims were not time barred. In discussing the evidence supporting delayed discovery, the court noted the plaintiff's president's lack of "knowledge of financing and accounting" as justifying his reliance on the accounting firm.  That justifiable reliance continued until the business hired a new accountant to replace the defendant accounting firm.  (*Id.* at pp. 842, 849.)  The court found

substantial evidence supported the conclusion that only the new accountant's professional assessment of the old accounting firm's work, and not the president's knowledge of accounting discrepancies, were enough to trigger accrual. (*Id*. at p. 849.) The court separately noted that the date of discovery was "moot" due to damages not occurring until later. (*Id*. at p. 851, fn. 4 ["since the jury found that no actual damages had occurred until after September 19, 1973, the date respondents discovered the negligence is moot"].) Given the procedural posture and alternative basis for the result, we do not view the facts in *Electronic Equipment* as compelling reversal in this case. Even setting these issues aside, the deference the *Electronic Equipment* president received as a layperson unversed in accounting did not extend into the period that the plaintiff had a new accountant assisting it in the matter in which the prior accountant's wrongdoing occurred.

In *Sherman v. Lloyd* (1986) 181 Cal.App.3d 693, the plaintiff was a limited partner in a partnership. The general partner had specifically told the plaintiff that the partnership was properly structured. Later, the plaintiff obtained independent counsel who advised that the partnership was not properly structured. The appellate court held that "[s]ince [the plaintiff] was in a fiduciary relationship with [the general partner], he was entitled to rely on [the general partner's] statements concerning the propriety of the investment structure. As such, [the plaintiff]'s cause of action did not accrue until he learned from counsel that the investment structure may have been improperly created." (*Id*. at p. 700.) Here again, the delay in discovery did not extend into the time that the plaintiff had

30

independent counsel to advise him in the matter in which the wrongdoing was alleged to have occurred.

*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, underscores the effect on discovery of a plaintiff's consultation with an independent fiduciary. In that case, the plaintiff suspected her doctors of malpractice and consulted an attorney about it. The attorney told her she had no provable claim. (*Id*. at p. 896.) She later consulted a second attorney, who advised that she did have a claim, and sued the doctors. (*Ibid*.) The trial court entered summary judgment for the doctors on statute of limitations grounds. The Supreme Court affirmed. It held that the first lawyer's advice that the plaintiff had no claim did not serve to extend her discovery period, finding no good reason to "extend[] a defendant's exposure when, despite plaintiff's discovery of the facts constituting his claim, and without defendant's fault, plaintiff is dissuaded from suit by the conduct of a third person." (*Id*. at p. 899.) It explained, "insofar as 'constructive notice' and 'diligent investigation' affect the computation of the limitations period, the plaintiff is generally charged with the lapses of attorneys acting in his behalf." (*Id*. at p. 900.) Put another way, Meighan's authorities suggest that a layperson advised by counsel who is independent of the wrongdoer is not treated as a layperson for the purposes of calculating accrual.

In urging that her discovery burden was reduced because she engaged Weinstock in 2015 in an unrelated matter, Meighan simply ignores that she was represented by Levinson in 2017 in *Howard v. Howard*. That Levinson was representing Meighan at the time was dispositive in the trial court's analysis. The cases Meighan cites in her briefing reflect that independent

representation is material. Even though our review is independent, it is Meighan's burden to show error in the trial court's decision. (See *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 252.) She cannot meet this burden by ignoring facts her own cases show to be significant.

Even if the reduced discovery burden applied here based on the alleged fiduciary relationship between Meighan and Weinstock, we would not find it useful to Meighan. As to the relaxed actual notice requirement, Meighan does not contend she lacked actual knowledge of the allegations that we have concluded were sufficient to put her on inquiry notice. Indeed, she concedes actual notice in her reply brief, acknowledging "actual notice of the[] allegations [of the 1A Howard Complaint] in 2017."

As to her claimed right to rely on Weinstock's purported "assurances" they committed "no wrongdoing," the actual alleged assurances are irrelevant to her later claims. The specific "assurance" Weinstock provided Meighan is alleged in the FAC as follows: "During [*Howard v. Howard*], Solarz . . . directly communicated with Meighan and denied any conspiracy between them" and Meighan's parents "understood their estate plans" and "consented to their estate plans as prepared by . . . Weinstock." These "assurances" did not address Dr. Howard's allegations that now form the basis of Meighan's claims. Nowhere does Meighan allege that Weinstock assured her that they obtained all necessary conflict waivers. Denying "any conspiracy" is not a denial of all allegations of "wrongdoing" where some of the alleged acts or omissions amounted to wrongdoing in the absence of any conspiracy. And contending that Dr. and Mrs. Howard

32

"understood" and "consented to" their estate plans is not an assurance that Weinstock "communicate[d] with [Dr. and Mrs. Howard] in a manner which would protect [Meighan] in case of an attack on the Trusts at a later time."[10]

Indeed, Meighan's FAC includes allegations that Dr. Howard *did* consent to and understand his estate plan. For example, Meighan alleges that (a) Dr. Howard "wished to have Meighan act as trustee" and "intended Meighan as the sole beneficiary" of the gift trust he funded; (b) making Meighan the sole beneficiary of the Howard Family Trust and disinheriting John Cedric was "in accordance with Dr. Howard's . . . wishes" and was his "express desire"; (c) Weinstock summarized for Dr. Howard the instruments contemplated to effect these objectives in October and November of 2012; and (d) Dr. Howard executed these instruments on December 18, 2012. Thus, Meighan's own pleadings reflect that assurances of consent and understanding are not incompatible with failure to communicate with Dr. Howard or document his intentions in a manner that would protect the transactions benefitting Meighan from later attack.

### b. Meighan Suffered Actual Injury More Than a Year Before She Sued Weinstock

The primary harm Meighan alleges in her FAC is an estimated $1.5 million in "attorneys' fees and costs" that she

---

[10] Meighan also points to Weinstock discovery responses wherein they deny failing to communicate with Dr. Howard. But this is not incompatible with Meighan's claims in her FAC that Weinstock failed to *adequately* communicate with Dr. Howard, e.g., "in a manner which would protect [Meighan] in case of an attack on the Trusts at a later time." Indeed, the FAC reflects that Weinstock *did* communicate with Dr. Howard, and even includes copies of illustrative correspondence as exhibits.

33

incurred defending herself in *Howard v. Howard*. Meighan argues that when she first suffered this harm is not susceptible to determination on demurrer because the timing of "actual injury" for accrual purposes requires "a case-by-case analysis, without many bright-line rules."

"The determination of actual injury requires only a factual analysis of the claimed error and its consequences. The inquiry necessarily is more qualitative than quantitative because the fact of damage, rather than the amount, is the critical factor. [Citation.] [¶] Of course, nominal damages will not end the tolling of section 340.6's limitations period. . . . Instead, the inquiry concerns whether 'events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.' [Citation.] However, once the plaintiff suffers actual harm, neither difficulty in proving damages nor uncertainty as to their amount tolls the limitations period." (*Jordache*, *supra*, 18 Cal.4th at p. 752.)

The parties' arguments concerning actual injury refer to judicially noticed documents. Meighan acknowledges her own declaration testimony that "Dr. Howard had notified [her] of the alleged wrongdoing of [Weinstock] as early as January 2017, causing her to retain counsel." But she claims that the reference to "wrongdoing" is ambiguous and could have referred either to alleged actual fraud or to simple negligence, resulting in a disputed issue of material fact. Weinstock ignores this argument, and further notes Meighan's acknowledgment below that "at all times prior to September, 2018, [she] incurred legal fees to defend against claims of intentional torts committed in an alleged conspiracy."

34

We do not view the *type* of wrongdoing Dr. Howard told Meighan he thought Weinstock had committed as material to the determination of when Meighan was harmed. Meighan claims in the FAC that deficiencies in Weinstock's work rendered the asset transfers and estate plan changes benefitting her susceptible to attack. To put it broadly, Meighan alleges that Dr. Howard would have had no colorable claims if Weinstock had properly discharged their duties: but for Weinstock's failures, "Dr. Howard would not have commenced litigation against Meighan . . . or such litigation would have been quickly and easily disposed of instead of contested litigation and a lengthy trial." Thus, the $1.5 million damages she claims is not limited to any particular theory underpinning Dr. Howard's eventual attack. In particular, it is not limited to fees and costs *Meighan* incurred defending Dr. Howard's claims against *Weinstock* for their professional negligence. Meighan generally claims for the fees and costs she incurred "in defending *herself*," individually and as trustee, in *Howard v. Howard*. (Italics added.) Put simply, Meighan's claimed damages are because Dr. Howard sued her and Weinstock's work did not allow Meighan to quickly and easily dispose of his claims. Dr. Howard's changing legal theories are irrelevant.

Further, the face of the FAC reflects that a material portion of Meighan's claimed damages was incurred more than year before Meighan sued Weinstock on September 9, 2019. Dr. Howard sued Meighan on April 10, 2017. Meighan alleges that "extensive discovery and heavily contested law and motion" practice occurred prior to trial, which commenced August 20, 2018, and culminated in a jury verdict on September 28, 2018. It would be unreasonable to read Meighan's complaint as

35

permitting that all or substantially all of Meighan's $1.5 million in claimed legal fees were incurred *after* September 9, 2018, such that only some nominal amount was incurred in the preceding 17 months the lawsuit was pending.  Those same 17 months encompassed "extensive discovery," "heavily contested law and motion," and the first 20 calendar days of trial.

For these reasons, we conclude that the actual injury Meighan alleges occurred more than a year before she sued Weinstock.  Because she also should have discovered her injury more than a year before she sued Weinstock, her claims are time barred and the trial court properly sustained Weinstock's demurrer.

### B. Leave to Amend

Meighan cites *Fox, supra,* 35 Cal.4th at page 810, for the proposition that it is abuse of a trial court's discretion to deny leave to amend when there is a reasonable probability that a complaint's defect can be cured.  Weinstock responds that the trial court did not err in denying her "pro forma and five-line request for leave to amend" contained in her opposition to Weinstock's second demurrer.[11]  Be that as it may, a plaintiff may show entitlement to leave to amend for the first time on appeal.  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 (*Rakestraw*).)

---

[11]    Meighan's request to the trial court was as follows: "Plaintiffs should be given leave to amend to add evidentiary facts as well, including Weinstock's own admissions made in the [*Howard v. Howard*] and its own identification of facts, witnesses, and documents denying any legal malpractice as alleged by Dr. Howard."

To show such entitlement, a "plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. . . . [Proposed] [a]llegations must be factual and specific, not vague or conclusionary. [Citation.] [¶] The burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of [his] causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend. [Citations]." (*Rakestraw*, *supra*, 81 Cal.App.4th at pp. 43–44.)

Meighan fails to satisfy her burden. She first asserts that she "can plead additional facts evidencing [her] lack of complete authority and control over Dr. Howard's estate at the time he retained [Weinstock] to perform the estate plan update." She then offers the conclusion that her lack of actual control over Dr. Howard's estate or his relationship with Weinstock renders her "not reasonably charged, as of 2017, with knowledge of the omissions that occurred" in the course of Weinstock's work. She offers no authority for this conclusion and we are aware of none. As discussed above, Meighan was properly charged with knowledge of the wrongdoing she alleges against Weinstock because the core facts underlying that wrongdoing were alleged in Dr. Howard's complaints against her and Weinstock, including in the July 2017 1A Howard Complaint. The degree of Meighan's control over the Howard estate in 2011 and 2012 does not affect her duty to investigate those allegations.

37

Meighan next asserts that she can plead more examples, from Weinstock's file produced in *Howard v. Howard*, of Weinstock's "direct dealings and communications with Dr. Howard concerning the 2011 and 2012 Trust Instruments." These, Meighan argues, would establish that she did not "command or control all communications between Dr. Howard and [Weinstock]," showing that "she did not read the complaint in [*Howard v. Howard*] from a place of inherent and actual knowledge of all communications between [Weinstock] and the omissions therein." First, Meighan fails to identify what her new allegations would be. And second, she again fails to establish what legal significance they would have. She did not need to know the full nature and extent of the communications between Dr. Howard and Weinstock to have her suspicions aroused by Dr. Howard's allegations that the communications were inadequate.

Finally, Meighan asserts that she "could allege, in more detail, the timing of [Weinstock's] production of their file," as well as other "sworn testimony provided by [Respondents]" (of undisclosed content), that "will confirm [her] reasonable diligence in investigating the fraud claims and the proper accrual of [her] present claims no earlier than September 2018." Again, Meighan fails to identify what her allegations would be. And she again fails to explain the legal basis for her conclusion that the undisclosed allegations would assist her.

For these reasons, Meighan has failed to show entitlement to leave to amend.

38

## DISPOSITION

The judgment is affirmed. Weinstock shall recover their costs on appeal.

HARUTUNIAN, J.[*]

We concur:

GRIMES, Acting P. J.

WILEY, J.

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.